Kristin Kalani, SBN 030240
Erin Rose Ronstadt, SBN 028362
Kevin Koelbel, SBN 016599
OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745
(602) 761-4443 Fax
kristin@oberpekas.com
erin@oberpekas.com
kevin@oberpekas.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Maria Lopez, a single woman,<br><br>                              Plaintiff,<br><br>v.<br><br>Yuma Regional Medical Center Long-Term Disability Plan, an ERISA benefit plan, and Sun Life Assurance Company of Canada, a plan fiduciary,<br><br>                              Defendants. | No.<br><br><br>**COMPLAINT** |

For her claims against Defendant Yuma Regional Medical Center Long-Term Disability Plan (the "Plan") and Defendant Sun Life Assurance Company of Canada ("Sun Life") (collectively, "Defendants"), Plaintiff Maria Lopez ("Plaintiff" or "Ms. Lopez") alleges as follows:

### JURISDICTION, VENUE, AND PARTIES

1.      This action arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. ("ERISA").

2.      Yuma Regional Medical Center ("YRMC") is the Employer and Plan Sponsor of the Plan.

3.      YRMC has its principal place of business in the State of Arizona.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

4.      The Plan is a single-employer welfare benefit plan under ERISA and is maintained for the exclusive benefit of eligible employees of YRMC. The Plan provides a comprehensive selection of employee welfare benefit programs, including but not limited to, medical, dental, vision, life, short-term disability ("STD"), and long-term disability ("LTD") coverage.

5.      YRMC is the Plan Administrator for the Plan and has the authority to control and manage the operation and administration of the Plan and the various benefit programs.

6.      YRMC administered the Plan to its employees, including Ms. Lopez.

7.      Ms. Lopez is a participant and beneficiary of the Plan by virtue of her employment with YRMC.

8.      Ms. Lopez is a single person. She currently resides in Yuma County, Arizona. Ms. Lopez has been a resident of Yuma County for the past 57 years.

9.      Sun Life is a licensed insurance company authorized to underwrite group LTD policies in Arizona.

10.      Ms. Lopez is informed and believes that YRMC and Sun Life are either named fiduciaries of the Plan pursuant to 29 U.S.C. § 1133(2); deemed fiduciaries pursuant to 29. U.S.C. § 1002(21)(A); or designated fiduciaries pursuant to 29 U.S.C. § 1105(c)(1)(B).

11.      Sun Life had actual or apparent authority to act as a fiduciary on behalf of the Plan.

12.      Defendants are licensed and authorized to do business in Yuma County, Arizona, and reside or are found within Yuma County within the meaning of the jurisdiction and venue provisions of ERISA, 29 U.S.C. § 1132 and 28 U.S.C. § 1391.

13.      This Court has jurisdiction over the subject matter of this action under ERISA, 29 U.S.C. §§ 1132(a), 1132(e)(1), and 28 U.S.C. §§ 2201-02 (declaratory judgments).

-2-

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

14.     Venue is proper in this Court under ERISA, 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1391(b).

## GENERAL ALLEGATIONS

15.     All previous and succeeding paragraphs are incorporated by reference.

### *Relevant Plan Provisions*

16.     YRMC provides LTD coverage to eligible employees through an insurance contract with Sun Life. In exchange for premiums under group policy number 18014-0001 (the "Policy"), Sun Life agrees to fully insure all LTD claims under the Plan and to assume financial liability for said claims. The total premiums paid by YRMC to Sun Life for the period July 1, 2011 through June 30, 2012 were $621,539.00.

17.     The Plan provides a monthly LTD benefit of 66.67% of an employee's "Total Monthly Earnings." Ms. Lopez's Total Monthly Earnings were her basic monthly earnings immediately prior to when her disability began. Because she was a non-exempt employee and paid on an hourly basis, Ms. Lopez's Total Monthly Earnings were based on her hourly rate of pay and did not exceed 40 hours per week. Commissions, bonuses, overtime pay and extra compensation are not included in Ms. Lopez's Total Monthly Earnings.

18.     Sun Life reported Ms. Lopez's Total Monthly Earnings as $3,633.07, and her gross monthly benefit as $2,422.17.

19.     To qualify for LTD benefits, the employee must be "Totally Disabled" throughout the "Elimination Period" and must be under the regular and continuing care of a physician. The Elimination Period is the period of continuous days of Total Disability with which no LTD benefits are payable. Ms. Lopez's Elimination Period was 90 days.

20.     For the Elimination Period and first 24 months, Total Disability is defined as the employee's inability due to injury or sickness to perform the "Material and Substantial Duties" of his or her "Own Occupation."  The Policy defines Material and

Substantial Duties as the essential tasks, functions, skills, or responsibilities required by employers for the performance of the employee's Own Occupation. They do not include those tasks, functions, skills or responsibilities that can be reasonably modified or omitted. An employee's Own Occupation is the usual and customary employment, business, trade, profession or vocation that the employee performed and as it is generally recognized in the national economy.

21.     After benefits have been paid for 24 months, the employee will be considered Totally Disabled if he or she is unable to perform, with reasonable continuity, any Gainful Occupation for which he or she is or will reasonably become qualified for by education, training or experience. The Policy defines Gainful Occupation as employment that is or can be expected to provide the employee with an income of at least 50% of his or her "Indexed Total Monthly Earnings."

22.     Indexed Total Monthly Earnings are the Total Monthly Earnings prior to the date of Total Disability adjusted on the first of the month following 12 calendar months of benefit payments, and each annual anniversary thereafter. The amount of the adjustment is equal to the lesser of 10% or the current annual percentage increase in the Consumer Price Index for Wage Earners and Clerical Workers as published monthly by the U.S. Department of Labor.

23.     Should Ms. Lopez remain eligible for LTD benefits throughout the Gainful Occupation period, she would be entitled to receive benefits until her Social Security Normal Retirement Age ("SSNRA"), which is 66 and 10 months. This would potentially entitle Ms. Lopez to LTD benefits through August 15, 2026.

### *Ms. Lopez's Claims for STD and LTD Benefits*

24.     Ms. Lopez began working for YRMC on or about December 8, 1986. As of her last day worked on September 18, 2012, Ms. Lopez worked as a Management Support Representative earning $20.96 an hour. Ms. Lopez dedicated 26 years of service to YRMC before leaving due to disability.

-4-

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

25.     As a Management Support Representative, Ms. Lopez provided administrative and managerial support to the YRMC department. She facilitated communications with physicians, management, employees, patients, other health-care and business professionals, government and regulatory agencies, the media, and outside service providers. In this capacity, Ms. Lopez was required to provide both efficient and effective management support to the department, which included preparing documents, scheduling and maintaining the Director's calendar, coordinating the Director's events and meetings, developing new office procedures as needed, participating in interviews of prospective employees, and performing and responding to the Director's correspondence and reports. She was also required to organize and maintain files and records accurately, prepare agendas and meeting minutes for team, committee and council meetings, assist the Director in assuring compliance with the bylaws, policies and procedures and in maintaining budgetary expenses. These were outlined as the essential functions of her job. She had to be able to perform them with or without reasonable accommodation.

26.     As a Management Support Representative, Ms. Lopez was required to be able to sit continuously for more than 2/3 of an eight (8) hour workday. She also had to be able to stand and walk occasionally for 1/3 of an eight (8) hour workday and had to be able to occasionally carry, lift, push, and pull loads of up to 25 pounds.

27.     Due to various medical issues, Ms. Lopez sought LTD benefits based on her inability to work. On or about December 7, 2012, Sun Life initiated a LTD claim for Ms. Lopez. The claim was assigned to Senior Benefit Analyst, Nicole Cournoyer.

28.     In a letter dated December 11, 2012, Sun Life acknowledged receipt of Ms. Lopez's application for benefits. Using a disability onset date of September 19, 2012 (the day after her last day of work) and calculating for the 90-day Elimination Period, Sun Life advised Ms. Lopez that her LTD benefits would begin to accrue on December 18, 2012.

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

29.     On or about December 11, 2012, Sun Life requested medical records from Ms. Lopez's treating providers. Records requests were submitted to Drs. Cragun, Clark, Wester-Ebbinghaus, and Rowe.

30.     On or about December 17, 2012, Ms. Lopez's claim was referred for an Occupational Analysis (the "OA"). The OA was completed on December 17, 2012 by vocational rehabilitation consultant, Mary Ellen Molyneaux.

31.     In her OA, Ms. Molyneaux concluded that Ms. Lopez's job as a Management Support Representative corresponded most closely with an Administrative Support Assistant, Administrative Coordinator, and Secretary Administrative Assistant under the Dictionary of Occupational Titles (the "DOT"). Ms. Molyneaux reported that these occupations typically existed in the general economy at a sedentary exertion level.

32.     The DOT was a publication produced by the United States Department of Labor, which helped employers, government officials, and workforce development professionals to define over 13,000 different types of work. It was first published in 1938. The last government updated version of the DOT was in 1991.

33.     The DOT is outdated and is not a reliable source for understanding occupations in today's general labor market. In 1998, it was replaced by the Occupational Information Network, or O*NET. The DOT has been rendered obsolete and is considered out-of-date by the Employment and Training Administration, as well as the Department of Labor. The Bureau of Labor Statistics stopped using it years ago and also considers it obsolete.

34.     After receipt of the OA and on December 24, 2012, Ms. Cournoyer developed an "Action Plan" for Ms. Lopez's claim. She listed outstanding information, which was needed to complete the review, including a copy of Ms. Lopez's driver's license, attendance and payroll records from March 3, 2012 through June 9, 2012, and medical records from Drs. Cragun, Clark and Rowe. She had already received records from Dr. Wester-Ebbinhaus.

OBER & PEKAS, PLLC
3030 North 3rd  Street, Suite 1230
Phoenix, AZ  85012
(602) 277-1745

35.     On December 26, 2012, Ms. Cournoyer completed a telephone interview with Ms. Lopez. She noted that the interview was "abbreviated," because Ms. Lopez was "tired and weak from her radiation treatments." When she asked Ms. Lopez about her activity level, Ms. Lopez confirmed that she was bedridden after the surgery. While she was capable of taking care of her activities of daily living ("ADLs"), she reported ongoing pain, fatigue, and nausea. At the time, Ms. Lopez was hopeful that she would be able to return to work after she completed her treatment and would not need to apply for Social Security Disability Insurance ("SSDI") benefits. She had worked for YRMC over 25 years and did not want to lose her job.

36.     On January 4, 2013, Ms. Cournoyer received Ms. Lopez's payroll information. With this information, she referred Ms. Lopez's claim to Jon Golych to calculate Ms. Lopez's Total Monthly Earnings. Mr. Golych determined Ms. Lopez's Total Monthly Earnings to be $3,633.07.

37.     On February 27, 2013, Ms. Cournoyer purportedly received notification from the medical records vendor that Ms. Lopez had instructed Drs. Rowe and Clark not to release records to Sun Life. However, as Ms. Lopez later made clear, she never provided that instruction.

38.     On March 5, 2013, Ms. Cournoyer updated her Action Plan and noted that medical records from Dr. Cragun were still outstanding. Sun Life received these on March 15, 2013.

39.     On March 25, 2013, Ms. Cournoyer referred Ms. Lopez's claim to University Disability Consortium ("UDC") for a nurse consultant review. In the referral form, Ms. Cournoyer asked the consultant to provide a report addressing Ms. Lopez's "exact diagnosis" and the medical evidence supporting the diagnosis and discussing Ms. Lopez's symptoms and functional impairment. The consultant was also asked to identify "medically reasonable functional impairments or restrictions" for Ms. Lopez and to provide an opinion as to whether she could sustain full time sedentary employment. The

consultant was to substantiate her opinion with "objective evidence," although the Plan does not contain an objective medical evidence requirement.

40.     In a letter dated March 25, 2013, Sun Life advised Ms. Lopez that it had referred her claim for review by its medical department.

41.     On April 5, 2013, Ms. Cournoyer updated her Action Plan. She noted, "**Medical review supports R&L's … Plan is to approve claim and f/u for [driver's license] in approval letter.**" (emphasis added)

42.     Sun Life received the nurse consultant report by April 18, 2013. The review was completed by Julie James, RN, BSN.  In her Synopsis, Ms. James noted that Ms. Lopez had been "out of work since 09/19/2012, resulting from high blood pressure/stress (9/18/2012) and endometrial cancer (11/19/2012)." She confirmed Ms. Lopez's date of disability as September 19, 2012.

43.     Based on her review of the limited medical evidence, Ms. James found that Ms. Lopez's diagnosis of grade III endometrial cancer was supported. Despite this, she concluded that with the exception of November 20, 2012 through December 24, 2012, Ms. Lopez was otherwise "capable of sustained full time sedentary employment on a full time basis" with some restrictions and limitations ("R&Ls") in lifting, carrying, pushing and pulling of 10 pounds. The exception that she made accounted for the various procedures and surgeries (dilation and curettage, hysteroscopy and loop electrosurgical excision, robotic assisted hysterectomy, bilateral salpingo-oophorectomy, pelvic and periaortic lymph node dissection and omentectomy) that Ms. Lopez underwent.

44.     Ms. James concluded that no R&Ls were supported from the date of disability through November 19, 2012 when Ms. Lopez had her first surgery. Ms. James noted that Ms. Lopez initially went out of work due to high blood pressure and stress, but that there were no records around this time to support these conditions.

OBER & PEKAS, PLLC
3030 North 3rd  Street, Suite 1230
Phoenix, AZ  85012
(602) 277-1745

45.     Ms. James also summarized the Attending Physician Statement ("APS")

form completed by Ms. Lopez's primary care physician, Dr. Clarence Clark, which is

provided below:

> It must also be noted that an APS dated 12/06/2012 by Dr. Clarence Clark,
> internal medicine, stated that the claimant had uncontrolled hypertension, anxiety,
> abdominal bloating and pain. This provider noted that the claimant has
> endometrial cancer and has undergone two surgeries for this condition and now
> must start radiation treatments. **Dr. Clark also noted that that the claimant was
> bed-ridden after her surgery, has had weakness and illness after surgery
> causing her complete physical impairment. No medical records from Dr.
> Clark were available at the time of this review to confirm any of these
> findings.**

(emphasis added)

46.     Ms. James concluded that Ms. Lopez could resume full time sedentary

employment as of December 24, 2012. However, this is contradictory to her position in

earlier parts of her report, where she noted:

> On 12/20/2012 [a post-operative visit after her hysterectomy] with Dr. Cragun,
> the claimant voiced some residual left lower quadrant pain, vaginal spotting and a
> urinary tract infection … Upon exam, Dr. Cragun noted that the port site incision
> was healing and the vaginal cuff had separation … The claimant was informed by
> this provider that the vaginal separation should granulate in and instructed her to
> pelvic rest for 6-8 weeks. She was also informed that she may return to work in a
> desk job (sedentary activities) on 12/24/2012 with restrictions with lifting…

> The file revealed post-operatively, the claimant would have been **incapable of
> any work capacity from 11/28/2012 and ongoing for 6-8 weeks**. This time
> would allow the claimant's vaginal separation to granulate, her incisional wound
> to heal and allow her pain to resolve so she would not require narcotic
> analgesics…

(emphasis added) Based on Ms. James' own observations, Ms. Lopez should have had

no work capacity at least through January 23, 2013.

47.     Ms. James discredited Dr. Cragun's earlier assessment of Ms. Lopez

stating, "In this writer's option, the restrictions and limitations identified on the APS by

Dr. Cragun dated 12/05/2012 are not supported by the documentation provided."

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

48.     On April 22, 2013, Sun Life mailed a status letter to Ms. Lopez advising her that it had completed its medical review but was in the process of evaluating her claim for benefit eligibility.

49.     On April 25, 2013, Ms. Cournoyer called Ms. Lopez. During the call, Ms. Lopez advised that she had just seen her doctor and that her cancer had spread to her neck. Because of these continuing medical issues, Ms. Lopez informed Ms. Cournoyer that she had contacted an attorney to help her with her application for SSDI benefits.

50.     Mr. Cournoyer spoke with Ms. Lopez again on April 26, 2013, May 1, 2013, and May 3, 2013. During these calls, Ms. Lopez provided Ms. Cournoyer with additional medical updates relating to her cancer related stress, and nervous breakdowns. Ms. Lopez clarified that she had never instructed Drs. Clark and Rowe to withhold records and agreed to sign a release to have their records immediately faxed to Sun Life.

51.     On May 8, 2013, Ms. Cournoyer updated her Action Plan. She noted that the medical review supported R&Ls but not through and beyond the Elimination Period. Ms. Cournoyer decided to wait for Drs. Clark and Rowe's medical records.

52.     That same day, Sun Life received 52 pages of medical records from Drs. Clark and Rowe. Ms. Cournoyer referred Ms. Lopez's claim back down to Ms. James for an addendum to review the additional medical records.

53.     On May 14, 2013, Sun Life received Ms. James' addendum. Ms. James summarized the records that she had received for Dr. Clark for the period September 18, 2012 through May 2, 2013, noting the following persistent symptoms and issues: back pain; fatigue; malaise; anxiety associate with difficulty concentrating, excessive worrying and nervousness; insomnia and sleep disturbance; hypertension with dizziness and chest pain; and epigastric pain.

54.     With each appointment record for 9/18/2012, 10/02/2012, 10/08/2012, 10/29/2012, 11/20/2012, and 12/19/2012, Dr. Clark noted that Ms. Lopez appeared in distress and was tearful, anxious, or agitated. Ms. James documented this in her

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

addendum. She also noted various medication prescriptions for Klonopin, Ambien, and Zoloft. In later appointment notes, she documented a mass on Ms. Lopez's neck, which was confirmed as a squamous cell carcinoma. Later exams also revealed lymph node enlargement in the right inguinal area.

55.     Despite all of this, Ms. James affirmed her previous position that Ms. Lopez could sustain full time sedentary employment from her date of disability to 11/19/2012 and again from 12/24/2012 to present.

56.     On May 17, 2013, Ms. Cournoyer updated her Action Plan. Based on Ms. James' addendum, Ms. Cournoyer recommended the denial of Ms. Lopez's claim. She noted, "Initial and Addendum medical review does not support R&Ls through and beyond the EP, plan is to deny claim as EE does not meet EP."

57.     Later that day, Ms. Lopez's claim was reviewed by Sun Life manager, Amy Hall. Ms. Hall agreed with the recommendation to deny benefits. She provided no explanation for her approval.

58.     In a letter dated May 31, 2013, Sun Life denied Ms. Lopez's claim for LTD benefits (the "First Denial").

59.     In the First Denial, Sun Life arbitrarily amended the disability onset date. Instead of September 18, 2012, Sun Life amended the onset date to November 19, 2012. This invariably affected the date that Ms. Lopez's LTD benefits became payable. Instead of December 19, 2012, the benefits onset date was pushed to February 16, 2013.

60.     In the First Denial, Sun Life conceded that Ms. Lopez's R&Ls were reasonably and objectively supported from November 19, 2012 through December 24, 2012. However, Sun Life concluded that the file did not support R&Ls that would preclude Ms. Lopez from performing her sedentary occupation from December 24, 2012 to the present.

61.     While Sun Life advised Ms. Lopez of her administrative appeal rights, it did not instruct Ms. Lopez on how to perfect her claim for benefits. The letter advised

-11-

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

that she "may submit written comments, documents, records or other information relating to her claim for benefits," but no other instruction was provided as to what was needed to perfect her claim.

62.     With the assistance of counsel, Ms. Lopez later requested a copy of her file from Sun Life. In a letter dated August 13, 2013, Ms. Lopez requested all "relevant" information under ERISA including, but not limited to: all information relied upon by Sun Life in making the benefit determination; all information submitted, considered or generated in the course of her claim regardless of whether it was relied upon in making the benefit determination; all information, which demonstrated compliance with the administrative processes and safeguards; and all internal policies or manuals concerning Ms. Lopez's medical conditions and diagnoses, regardless of whether they were relied upon in making the benefit determination.

63.     Through counsel, Ms. Lopez also requested her plan documents from YRMC on August 13, 2013.

64.     In a letter dated November 27, 2013, Ms. Lopez appealed Sun Life's First Denial (the "Appeal"). In support of her Appeal, Ms. Lopez provided Sun Life with 2,531 pages of documentation supporting her claim. Ms. Lopez objected to Sun Life's date of disability, which had changed without explanation. She also provided additional medical records, which proved her disability from September 19, 2012 through November 19, 2012 and after December 24, 2012. Updated medical records supported additional diagnoses of Lynch Syndrome (genetic predisposition for colon cancer confirmed by genetic testing), major depression, anxiety and panic disorder, fibromyalgia, and esophageal ulcers. In addition to these medical records, Ms. Lopez also provided assessment forms from three different treating physicians, including Dr. Clark, her psychologist, and rheumatologist. Based on their in-person examinations of Ms. Lopez, they determined that she could not sustain any level of work, had serious

symptoms and impairments, and had poor functional status with compromised activities of daily living.

65.     With her Appeal, Ms. Lopez also requested additional time with which to supply Sun Life with other medical records based on other diagnostic testing and workup that was pending at the time.

66.     In a letter dated December 3, 2013, Sun Life agreed to toll the appeal review for 60 days or through February 3, 2014.

67.     On February 3, 2014, Ms. Lopez provided all of the supplemental records in support of her Appeal. She provided 237 pages of new documentation, including a letter from the Social Security Administration ("SSA") dated January 16, 2014, confirming the SSA's approval of her SSDI benefits.

68.     In the February 3, 2014 letter, Ms. Lopez requested that Sun Life give proper consideration to her SSDI award. This was, in part, because the SSA had determined that the medical evidence supported a disability onset date of September 17, 2012. This aligned and supported the time period that Ms. Lopez initially claimed Total Disability under the Plan. Additionally, the SSA determined that Ms. Lopez's conditions and impairments were of sufficient severity to meet the criteria for SSDI benefits, which was considerably more stringent than that required under the Plan.

69.     The SSA defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical … impairment" that is of "such severity that [the claimant]… cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives." 42 U.S.C. § 423(d)(1)(A), (2)(A).

70.     Ms. Lopez's counsel communicated the statutory review deadlines to Sun Life advising that she had calendared Sun Life's initial 45-day review deadline as March 25, 2014. If an extension was needed, Sun Life was entitled through potentially May 6,

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

**OBER & PEKAS, PLLC**
3030 North 3rd  Street, Suite 1230
Phoenix, AZ  85012
(602) 277-1745

2014 to make a determination on Ms. Lopez's claim. Sun Life clarified its position regarding the review deadlines advising that the initial 45-day review period expired on March 19, 2014 and the extension expired on May 3, 2014.

71.     During the time Ms. Lopez's Appeal was pending review, Sun Life never requested Ms. Lopez's SSDI file from either the SSA or directly from Ms. Lopez. It had valid authorization to request information related to her award.

72.     Despite overwhelming medical evidence supporting Ms. Lopez's claim, the LTD Claims Senior Consultant, Steven Leask, affirmed the decision to deny Ms. Lopez's LTD benefits in a letter dated April 8, 2014 (the "Final Denial"). He based his decision exclusively on reports secured by Sun Life on appeal by medical reviewers, Drs. Richie and Mazzella.

73.     Based on the adversarial nature of the Final Denial, Ms. Lopez is informed and believes that Mr. Leask is an attorney for Sun Life. His LinkedIn profile confirms that he has a law degree from University of Tulsa College of Law. He serves as a Senior Consultant for "Appeals and Litigation."

74.     Mr. Leask has a history of manipulating the facts. *See, e.g. Foster v. Sun Life Assur. Co.*, 2009 U.S. Dist. LEXIS 94779, at *24 (D.Me. Oct. 7, 2009, No. 09-CV-131-B-W) ("The administrative record reflects that Mr. Leask engaged in a form of file choreography that, whether by design or inadvertence, unreasonably danced around the material question of how Ms. Foster's symptoms of chronic pain correspond to the disability determination.")

75.     In the Final Denial, Mr. Leask was openly adversarial to Ms. Lopez. Instead of construing ambiguities in her favor, he was inherently distrustful of her claim and questioned her purported refusal to return to work based on Dr. Cragun's note that she could return to her desk job effective December 24, 2012. Mr. Leask completely disregarded all of the additional medical records thereafter, which verified Ms. Lopez's continuing pelvic pain complaints. In fact, her pain only worsened after her appointment

-14-

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

with Dr. Cragun. Ms. Lopez underwent a pelvic ultrasound on February 14, 2013 to assess her "post-op pelvic pain." Later exams revealed tenderness above the vaginal cuff. Because her pain did not improve or subside, Ms. Lopez submitted to further testing at the recommendations of Drs. Cragun and Wester-Ebbinghaus. On June 24, 2013, Ms. Lopez underwent a CT scan of her abdomen and pelvis. This was all explained in Ms. Lopez's Appeal.

76.     The Final Denial did not present Ms. Lopez's medical conditions and treatment history fairly or accurately. Again, Sun Life disregarded Ms. Lopez's prior medical history and continuing pain complaints, which were deemed credible by her treating providers. Sun Life ignored and disregarded critical parts of Ms. Lopez's medical records.

77.     In the Final Denial, Mr. Leask provided a new reason for denial that was never previously raised:

> Because Ms. Rico [Lopez] was not Totally Disabled as of December 24, 2012 and she did not return to work, her employment was deemed terminated because she was not Actively at Work and not in an Eligible Class as of December 24, 2012. **Since her employment was deemed terminated under the Policy as of December 24, 2012, Ms. Rico's [Lopez] LTD insurance coverage also terminated on December 24, 2012 and Ms. Rico [Lopez] was not covered by the Policy for any Sickness or Injury following December 24, 2012.**

(emphasis in original)

78.     Mr. Leask purportedly considered Ms. Lopez's SSDI award, but found it unpersuasive in light of the medical reviews secured by Sun Life.

79.     In the Final Denial, Mr. Leask provided a settlement offer of $2,422.17 for the full release and discharge of her claim, which was equivalent to one month of benefits.

80.     Since her last day worked, Ms. Lopez has remained Totally Disabled under the Policy and Plan.

-15-

OBER & PEKAS, PLLC
3030 North 3rd  Street, Suite 1230
Phoenix, AZ  85012
(602) 277-1745

81.    Ms. Lopez has seen various specialists for her symptoms without relief. She has developed further medical conditions and received diagnoses since filing her claim.

82.    Ms. Lopez cannot perform the Material and Substantial Duties of her Own Occupation or any Gainful Occupation.

83.    Ms. Lopez continues to be Totally Disabled as defined by the Policy and Plan for LTD benefits.

84.    Ms. Lopez has exhausted her administrative remedies under the Plan.

85.    Ms. Lopez has satisfied all of the jurisdictional prerequisites to filing her claims, and her claims are timely before this Court.

86.    On information and belief, Ms. Lopez may be entitled to additional benefits from YRMC as a disabled employee including, but not limited to, health insurance, life insurance, supplemental LTD benefits, and pension benefits.

**COUNT I**
**(Recovery of Plan Benefits)**
**(The Plan and Sun Life)**

87.    All previous and succeeding paragraphs are incorporated by reference.

88.    The Plan is a single-employer welfare benefit plan under ERISA, 29 U.S.C. § 1002.

89.    The Plan provides LTD coverage and a promise to pay benefits until Ms. Lopez is no longer Totally Disabled under the terms of the Plan.

90.    Ms. Lopez became Totally Disabled in September 2012 and continues to be Totally Disabled. Due to her medical conditions and the supporting medical evidence, Ms. Lopez would not be able to reliably perform her Own Occupation or any Gainful Occupation. She has claimed the LTD benefits under the Plan to which she is entitled.

91.    Ms. Lopez reasonably expected that her conditions met the requirements of Total Disability as defined by the Plan, and that she would receive benefits under the Plan until she was no longer Totally Disabled or until her SSNRA, August 15, 2026.

-16-

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

92.     Sun Life improperly denied Ms. Lopez's LTD benefits in breach of the Plan. This breach was arbitrary, capricious, an abuse of discretion, not supported by substantial evidence, and clearly erroneous.

93.     As the decision-maker and payer of her claim, Sun Life administered Ms. Lopez's claim under a structural conflict of interest.

94.     Ms. Lopez is informed and believes that Sun Life was influenced by an improper conflict of interest. Sun Life has failed to produce any evidence that it protected Ms. Lopez from its conflict and instead intentionally withheld information that would have otherwise revealed the depth of its self-interested conduct.

95.     Ms. Lopez is informed and believes that Sun Life does not have proper safeguards to ensure that its focus on profitability does not affect how its employees handle, evaluate, and assess claims.

96.     On information and belief, as an institution, Sun Life uses claim payment reduction goals and cost containment measures as a method of profitmaking for the company. In doing so, Sun Life unfairly and arbitrarily reduces or denies payments on legitimate claims in an across-the-board fashion to attain its numerical reduction goals. Sun Life's cost containment measures are consistent with and part of a corporate-wide plan and scheme.

97.     On information and belief, Sun Life offers incentive or bonus programs to award and encourage employees to meet its savings and operational goals.

98.     On information and belief, Sun Life instructs and/or incentivizes its employees to deny and to terminate otherwise legitimate claims.

99.     Sun Life's bad faith and structural conflict is also evidenced in part by its many procedural irregularities. The record supports that Sun Life placed its financial interest above Ms. Lopez's best interests in administering her claim.

100.    Sun Life committed several procedural violations and denied Ms. Lopez a full and fair review throughout the initial claims and appeals process. It shifted its

-17-

OBER & PEKAS, PLLC
3030 North 3rd  Street, Suite 1230
Phoenix, AZ  85012
(602) 277-1745

reasons for denial throughout the appeals process, refused to identify or instruct Ms. Lopez on the specific evidence needed for her claim, and relied on the opinions of its non-examining physicians to the exclusion of other credible evidence. Sun Life selectively reviewed her medical records, unreasonably disregarded supporting documentation during the appeal including her SSDI award, and failed to procure necessary medical reviews by qualified reviewers.

101.    In denying her claim for LTD benefits, Sun Life ignored credible medical evidence, which supported her eligibility for benefits. Sun Life disregarded critical medical records from Ms. Lopez's treating providers, and other relevant information regarding her symptoms, medication intolerance and side effects, and difficulties with ADLs. Sun Life's medical reviewers intentionally misstated the medical evidence and the assessments of Ms. Lopez's treating providers. Ms. Lopez's complaints were credible and accepted by her treating physicians. Sun Life did not articulate compelling reasons for discounting her subjective complaints.

102.    Sun Life's medical reviewers arbitrarily reached their opinions based on insufficient evidence or investigation. They did not personally evaluate Ms. Lopez nor did they perform their due diligence with respect to getting proper clarification from Ms. Lopez's treating providers. In fact, no reviewer made contact with Ms. Lopez's treating physicians to clarify her disputed date of disability, medical conditions, or functionality.

103.    Although an insurer is generally not required to seek an in-person examination under ERISA, Sun Life's failure to do so in this case demonstrates an abuse of discretion. Sun Life had authority under the Policy to subject Ms. Lopez to an in-person examination but, unreasonably chose not to exercise this option.

104.    Sun Life's medical reviewers did not have the requisite knowledge, experience or training to opine on her medical conditions or ability to work and should not have been considered over the weight of Ms. Lopez's treating providers.

105.    Sun Life engrafted additional requirements onto the Plan that were not contemplated by the parties or required by the Plan, including but not limited to its requirement for "objective" evidence. Sun Life required objective medical evidence, but the Plan does not have an objective medical evidence requirement. Even when Ms. Lopez presented objective medical evidence, Sun Life unreasonably ignored it.

106.    Sun Life failed to provide its medical reviewers with all of the relevant evidence, including that which favored the approval of Ms. Lopez's claim. While Sun Life made sure to provide its medical reviewers with prior adverse reviews by other examiners (Ms. James' initial report and addendum), it withheld information that supported Ms. Lopez's inability to work. For instance, it withheld Ms. Lopez's SSDI award and other information supplied on Appeal, including the **three assessments from Ms. Lopez's treating physicians.**

107.    ERISA requires a "meaningful dialogue" between a plan fiduciary and a beneficiary. Under 29 C.F.R. § 2560.503(g)(iii), when a plan fiduciary denies a claim, the notification must provide "a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." It must also be relayed in a manner calculated to be understood by the claimant.

108.    Sun Life failed to identify what was needed for Ms. Lopez to perfect her claim under the Plan.

109.    Sun Life improperly added a new reason to the Final Denial, insulating this reason from further review. In the Final Denial, Sun Life clarified that it would only consider Ms. Lopez's SSDI file and nothing more.

110.    Sun Life failed to sufficiently address Ms. Lopez's SSDI award. It did not put forth even a modicum of effort to discuss or even request the underlying decision or file, despite having written authorization and more than plenty of time under the statutory timeframes (90 days) to obtain it. Instead, Sun Life affirmed the denial and

-19-

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

invited Ms. Lopez to engage in what was essentially another drawn out review and/or appeal. Sun Life should have requested the file from the SSA or asked Ms. Lopez for the file prior to completing its review.

111.    The relevance of Ms. Lopez's SSDI award to her LTD claim was significant. The SSA found Ms. Lopez disabled under the SSA's regulations beginning September 17, 2012, which corresponded to the original date of disability that Sun Life found but later changed. Additionally, by virtue of the award, the SSA determined that Ms. Lopez's impairments were sufficiently severe such that she was disabled not only from her ***past relevant work*** but also ***any gainful work.*** Ms. Lopez's SSDI award was premised on a more stringent definition than that required under the Policy. Moreover, her SSDI award was issued contemporaneously with Sun Life's review, and therefore was not an aged award. Sun Life's failure to properly consider the SSDI award was not only unreasonable but also further evidence of its conflict and intent to deny Ms. Lopez's claim.

112.    Sun Life's failure to adequately investigate Ms. Lopez's claim is further evidence that Sun Life illogically denied the claim without adequate support from the record, thereby abusing its discretion.

113.    In the event that YRMC properly delegated Sun Life with discretionary authority, Sun Life's numerous procedural errors rise to the level of a "wholesale and flagrant" violation of ERISA, entitling Ms. Lopez to de novo review with a bench trial on the record.

114.    If Sun Life is entitled to review under an abuse of discretion standard, this Court should review Sun Life's decision with heavy skepticism, because there is ample evidence of Sun Life's malice, self-dealing, and biased claims handling as a result of its conflicted status.

115.    Because of Sun Life's improper conduct, Ms. Lopez was denied a full and fair review of her claim.

116.    Pursuant to the coverage provided under the Plan, to ERISA 29 U.S.C. § 1132(a)(1)(B), and to applicable federal and state common law, Ms. Lopez is entitled to recover all benefits due under the terms of the Plan, and to enforce her rights under the Plan.

117.    Ms. Lopez is entitled to reinstatement of any other employee benefits that were terminated, discontinued, or suspended as a result of the denial of her disability benefits. She is entitled to a restoration of the status quo ante before her benefits were wrongfully denied.

118.    Pursuant to 29 U.S.C. § 1132(g), Ms. Lopez is entitled to recover her attorneys' fees and costs incurred herein from Defendants.

119.    Ms. Lopez is entitled to prejudgment interest on the benefits to which she is entitled and on her damages at the highest legal rate until paid in full.

WHEREFORE, Ms. Lopez prays for entry of judgment against Defendants as follows:

A.    For all past LTD benefits under the terms of the Plan;

B.    For an award of prejudgment interest on her LTD benefits at the highest legal rate until paid in full; and

C.    Clarifying and determining her rights to future benefits under the terms of the Plan;

E.    For an award of her attorneys' fees and costs incurred herein;

F.    For such and further relief as the Court deems just and reasonable.

1

2    Dated this 17th day of March, 2016.

3                                    OBER & PEKAS, PLLC

4

5                              By: *s/ Kristin Kalani*
                                    Kristin Kalani
6                                   Erin Rose Ronstadt
                                    Kevin Koelbel
7                                   Attorneys for Plaintiff

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745